IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LATARSHA WILLIAMS,

              Plaintiff,

    v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

              Defendant.

HONORABLE JEROME B. SIMANDLE

Civil No. 12-5637

**OPINION**

APPEARANCES:

Philip Wolf, Esq.
Wolf and Brown L.L.C.
228 Kings Highway East
Haddonfield, NJ 08033
    Attorney for Plaintiff

Paul J. Fishman, United States Attorney
By: Monika K. Proctor, Special Assistant United States Attorney
c/o Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
    Attorney for the Commissioner of the Social Security
    Administration

**SIMANDLE**, Chief Judge:

# I.   <u>INTRODUCTION</u>

    This matter comes before the Court on Plaintiff Latarsha

Williams's appeal of the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying her

application for Disability Insurance Benefits under Title II of

the Social Security Act ("Act"). The Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).

Plaintiff argues that (1) the Administrative Law Judge ("ALJ") erred as a matter of law by not obtaining testimony from a vocational expert ("VE"), (2) the ALJ's determination of Plaintiff's Residual Functional Capacity ("RFC") was not supported by substantial evidence, and (3) the ALJ erred by finding that Plaintiff's Generalized Anxiety Disorder was not a severe impairment.

The Court holds that (1) the ALJ erred by failing to use VE testimony or a permissible substitute, (2) the ALJ's determination of Plaintiff's RFC was not supported by substantial evidence, and (3) even if the ALJ should have found that Plaintiff's Generalized Anxiety Disorder was a severe impairment, such error was harmless. The Court will vacate the Commissioner's decision and remand.

## II.  BACKGROUND

### A. Procedural History

Plaintiff was born in 1971, has a high school education, and has worked as a waitress, telemarketer, and assistant nursing home director. (R. at 109, 212.) In July of 2003, Plaintiff fell down the stairs and injured her back. (R. at 29.) She stopped working due to medical conditions, including herniated discs, severe back pain, anxiety, and a tumor. (R. at 211.) Plaintiff's date of last

employment is June 1, 2004 (R. at 211), and her date last insured is September 30, 2009. (R. at 27.)

On August 8, 2005, Plaintiff applied for disability insurance benefits alleging that she had been disabled since June 1, 2004. (R. at 103.) On September 1, 2006, Plaintiff's initial claim was denied and, on February 20, 2007, her claim was denied upon reconsideration. (R. at 103.) In response to the denial, Plaintiff filed a Request for Hearing, which was granted and occurred on June 20, 2008 before ALJ Joseph M. Hillegas. (R. at 103.) In his September 25, 2008 decision, the ALJ concluded that Plaintiff could perform her past work as a telemarketer, and thus, was not disabled. (R. at 109-10.)

Plaintiff requested Appeals Council Review, which was granted. (R. at 112-14.) On November 9, 2009, the Appeals Council issued a remand order instructing the ALJ to update the evidence on Plaintiff's medical condition; further consider Plaintiff's maximum RFC; explain assessed limitations of Plaintiff's mental impairments; and obtain supplemental evidence from a VE to clarify the demands of Plaintiff's past relevant work and/or the effect of the assessed limitations on Plaintiff's occupational base. (R. at 113.) The ALJ was also directed to ask the VE to identify examples of appropriate work that Plaintiff could perform. (R. at 113.)

On remand, the ALJ held a second hearing and decided that Plaintiff was not disabled because she was capable of performing

other work that existed in significant numbers in the national economy. (R. at 25, 33.) Plaintiff requested Appeals Council Review, but her request was denied. (R. at 12-14.) Plaintiff then filed the instant appeal. [Docket Item 1].

### B. Plaintiff's Complaints

At the administrative hearings, Plaintiff testified regarding her physical and mental problems.

Plaintiff's primary physical complaint was constant back pain. (R. at 211.) She stated that the pain came from her lower back and shot up into her midsection (R. at 65); "radiat[ed] down her posterior right side into her groin" (R. at 317); intermittently went into her legs (R. at 417); and reached into her buttock and posterior thigh (R. at 386). She described her pain as sharp, shooting, stabbing, constant, burning, aching, stinging, and including numbness at times. (R. at 228, 317, 362.) Plaintiff noted that her pain occurred when she moved her shoulders and lower back (R. at 525); worsened when she sat down or stood up (R. at 362); occurred every day on and off (R. at 220); and was ongoing and worsening since 2004 (R. at 317, 417). She also explained that activity exacerbated her pain and medication alleviated it (R. at 317, 362), but the medication side effects caused her to lie down (R. at 230). She also noted that she had neck pain and weakness in her lower extremities. (R. at 417.)

At the initial hearing, Plaintiff said she dealt poorly with the pain and it disturbed her sleep. (R. at 55, 362.) She claimed that the pain affected her ability to work. (R. at 57.) She testified that, due to her pain, she could not sit, stand or walk for prolonged periods of time, or lift/carry significant weights in a work setting. (R. at 28-29.) Plaintiff further explained that she could stand for about five minutes before she had to sit, sit for about fifteen minutes before she had to stand up and move, and maybe lift a gallon of milk. (R. at 61-62.)

Plaintiff described her daily routine. She began her days by sending her daughter to school. (R. at 51.) She then took her medication and tried to eat something before laying down. (R. at 51.) Typically, she "tr[ied] not to do too much work" and she "tr[ied]to lay around." (R. at 52-53.) She testified that her sister came every other day to tidy the home. (R. at 52.) On "good days" she prepared meals for herself and her family, but on "bad days" her sister cooked and brought meals. (R. at 53.) Plaintiff's uncle took her shopping once a month, lifted things, and brought her milk. (R. at 53-55.)

Plaintiff's son helped her make the bed and put her shoes on. (R. at 82-83, 92.) She had trouble going up stairs, dressing, and bending. (R. at 90-92.) She did not attend church because she could not sit in the seats. (R. at 56.) She said leaning forward in a chair was painful and leaning backward was better. (R. at

64.) Plaintiff reported that she did not drive and, instead, obtained transportation from a Welfare program. (R. at 51.)

In terms of her mental problems, Plaintiff reported that her main psychological symptom was that she did not want to be around people. (R. at 67.) She said she did not go out to socialize and she had anxiety. (R. at 68-69.) She got agitated and did not want to deal with people (R. at 92); she only interacted with her children, sister, and uncle (R. at 67). She also explained that on bad days she did not want to see anyone or talk on the telephone. (R. at 63.) Plaintiff's bad days happened around twice a month and more frequently when it rained. (R. at 63.)

Plaintiff also complained that she cried often (R. at 319), and that her anxiety caused difficulty breathing (R. at 92, 319), difficulty remembering, insomnia, poor appetite, and panic attacks (R. at 403). She claimed to have emotional problems due to back pain, constant worrying, not knowing if she can deal with people, and having a lack of "get up and go." (R. at 388.) Plaintiff also said she suffers from depression (R. at 362) and cannot concentrate because of her mental limitations (R. at 211).

## C. Medical History: Physical Impairments

### i. Physicians Who Treated Plaintiff

#### (a) Diagnoses and Findings

The record contains reports from five different doctors and a physical therapist, who all examined Plaintiff and diagnosed substantial problems with her back, spine, and mobility.

Plaintiff's family physician, Dr. Peter Kuponiyi, treated Plaintiff since 1998 and reported that she had persistent low back pain since her accident. (R. at 29.) Dr. Kuponiyi assessed that Plaintiff was limited in standing, walking, climbing, stooping, bending and lifting; that she was unable to work full time; and that she could perform few of the duties of her usual occupations or self-care. (R. at 313-15.) He diagnosed Plaintiff with lumbar radiculopathy and fatigue. (R. at 313.)

Dr. Kuponiyi referred Plaintiff to Dr. Anthony Surace, a pain specialist. (R. at 317-18.) Dr. Surace assessed that Plaintiff had chronic low back pain secondary to lumbar radiculopathy and post-surgical neuropathy. (R. at 318, 380). In March 2006, Dr. Surace noted that Plaintiff had been in the hospital the previous month with left knee and cervical pain. (R. at 380.) He then assessed Plaintiff's condition as lumbar radiculopathy and possible cervical radiculopathy. (R. at 380.)

On August 3, 2006, Plaintiff had a lumbar spine MRI showing a moderate degree of central canal stenosis of L4-5 with thickening of the ligamentum flavum and central disc protrusions at L4-5 and L5-S1. (R. at 461.)

Dr. James Goydos examined Plaintiff and stated that Plaintiff's exam was remarkable for weakness and hyporeflexia in both lower extremities. (R. at 434.) Dr. Goydos also noted that Plaintiff continued to have neurologic symptoms, which were likely unrelated to her neurofibroma, but were very concerning for neurologic impairment. (R. at 435.)

Plaintiff's pain management was transferred from Dr. Surace to Dr. Morris Antebi, who first examined her on March 29, 2007. (R. at 362.) Dr. Antebi's examination showed that Plaintiff's back was tender and that back flexion was at 60 degrees. (R. at 362.) He noted that there were no neurological deficits and that straight-leg raising was negative. (R. at 362.) Dr. Antebi referenced the August 3, 2006 MRI results and diagnosed Plaintiff with lumbar discogenic disease. (R. at 363.)

During a different examination, Dr. Antebi found that Plaintiff had extreme tenderness on palpation in the cervical spine and paraspinal muscles, in the upper trapezius, and in the lumbar paraspinal muscles. (R. at 512.) He also noted that she ambulated without assistive devices, had intact judgment and appropriate affect, and had no neurological deficits. (R. at 512.)

Dr. Kuponiyi referred Plaintiff to physical therapy at the Bacharach Institute for Rehabilitation. (R. at 386.) The report from Bacharach indicated that Plaintiff had decreased strength and range of motion in her right hip and functional limitations

unchanged in walking and sitting five minutes with frequent repositioning. (R. at 386.) The report also noted that she had an 80 percent inability to participate in physical activities and a 40 percent impairment in house activities, including her avoidance of vacuuming and her need to rest frequently. (R. at 386.)

The physical therapist stated that Plaintiff had "significant weakness in the right lumbar trunk extensor muscles and quadratus lumborum" with Plaintiff being "unable to tolerate resistance against shoulder flexion" due to loss of "muscular stabilization in the right lower back". (R. at 387.) She noted Plaintiff had a pelvic obliquity due to trunk weakness. (R. at 387.)

Dr. Kuponiyi also referred Plaintiff to Dr. Syed Jaffrey of Premier Neurology. (R. at 417.) Dr. Jaffrey reported that Plaintiff's posture was not straight because her neck was tilted toward the left. (R. at 417.) He found that Plaintiff should avoid "prolonged sitting and standing". (R. at 514.)

Dr. Jaffrey ordered a repeat MRI of the lumbar spine that revealed that at L4-5, "there is a disc bulge with a superimposed central disc herniation and annular tear. There is indentation upon the ventral aspect of the thecal sac with mild central spinal canal and bilateral neural foraminal stenosis." (R. at 522.) Additionally, the MRI revealed that at L5-S1, "there is a central disc herniation, which indents the ventral aspect of the thecal

sac. There is no central spinal canal stenosis. There is mild
bilateral neural foraminal stenosis." (R. at 522.)

An EMG study was also performed at Premier Neurology that
showed right L4, L5 radiculopathy. (R. at 555.) Follow-up with Dr.
Jaffrey resulted in three diagnoses: (1) lumbago, (2) lumbosacral
root lesions, not elsewhere classified, and (3) spasmodic
torticollis. (R. at 539.) Dr. Jaffrey ordered a final MRI, which
indicated disc osteophyte complex with central protrusion at C2-C3
and C3-C4 level causing mild compression of the thecal sac. (R. at
551.)

### (b) Interventions

In late 2004, Plaintiff underwent a surgical excision of a
cystic mass in her lumbar spine area (R. at 298) which was later
determined to be a benign neurofibroma (R. at 29). Since then,
Plaintiff has been prescribed multiple treatments. Dr. Kuponiyi
prescribed Ibuprofen, Lidoderm patches, and Oxycontin to
Plaintiff. (R. at 215.) Dr. Surace prescribed Topomax, Percocet,
and Zanaflex (R. at 318, 382, 369-70), and Dr. Antebi prescribed
Ultram (R. at 363). Drs. Surace and Antebi also prescribed four
epidural injections. (R. at 318, 361, 364.) Additionally, Dr.
Antebi administered a trigger point injection in her left upper
trapezius. (R. at 512.) The physical therapist also recommended a
trial with a back brace. (R. at 387.)

Plaintiff reported that the treatments had both helped her condition (R. at 362) and worsened it (R. at 340, 342).

### ii. Non-Examining and Other Source Evaluations

The record contains medical opinions from three consultants, who did not provide medical care to Plaintiff.

In June 2006, Plaintiff consulted with Dr. Paul Steel. (R. at 340.) Dr. Steel examined Plaintiff and found that she had motion about the trunk that was 80 percent of normal with guarding and some discomfort in the lower back. (R. at 343). He also noted that Plaintiff was quite uncomfortable lying prone on the exam table. (R. at 343.)

Dr. Arthur Pirone, a state agency medical consultant, reviewed the record and completed a physical residual functional capacity assessment. (R. at 347-54.) Dr. Pirone concluded that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk up to six hours in an eight-hour workday; sit up to six hours in an eight-hour workday; and occasionally stoop, crouch, crawl, and climb ladders, ropes, and scaffolds. (R. at 348-49.)

Dr. Ronald Banger performed an orthopedic consultative examination in which Plaintiff ambulated with a slow but normal gait, stood intermittently during the interview, and had a normal cervical examination. (R. at 420.) Dr. Banger reported that flexion/extension of the lower back was normal and there was no

pain on straight-leg raising, but noted that Plaintiff had pain on movement of the lower back. (R. at 420.) Dr. Banger's impression was that Plaintiff suffered a lumbosacral strain. (R. at 421.) He indicated that Plaintiff could lift and carry weights up to 20 pounds frequently and up to 50 pounds occasionally; could sit three hours at one time and five hours total in an eight hour workday; and could stand two hours at one time and three hours in an eight hour workday. (R. at 425-25.) Dr. Banger reported that Plaintiff occasionally had postural limitations. (R. at 428.)

After the second administrative hearing, Dr. Banger conducted a second consultative physical examination of Plaintiff in April of 2010. (R. at 524.) Dr. Banger noted that Plaintiff ambulated with marked difficulty, got on and off the examining table with marked difficulty, was uncomfortable in the seated position during the interview, and would not attempt movement of the cervical spine. (R. at 524-25.) Dr. Banger's impression was that Plaintiff suffered from cervical sprain/strain and lumbar sacral strain. (R. at 524-25.) He stated that the objective findings did not correlate with Plaintiff's marked difficulties. (R. at 525.) Dr. Banger opined that Plaintiff, in an eight hour workday, could frequently lift and carry up to 20 pounds and occasionally up to 50 pounds, and could sit, stand, and walk for one hour at a time and a total of three hours in a workday. (R. at 529-30.)

**C. Medical History: Mental Impairments**

## i. Treating Source Evaluations

In addition to the treatment and examinations for her physical ailments, Plaintiff also received evaluations of and treatment for her mental health.

Plaintiff was a patient of Atlanticare Behavioral Healthcare ("ABH") since early 2006. (R. at 388.) Plaintiff's diagnosis was Generalized Anxiety Disorder with presenting problems of anxiety, sleep difficulty, and decreased appetite. (R. at 355.) At her intake, her Global Assessment of Functioning ("GAF")[1] score was 60. Plaintiff also received a GAF score of 55 on multiple occasions. (R. at 389, 415.) Dr. Mohammad Ashfaq, a board certified psychiatrist, diagnosed generalized anxiety disorder and placed Plaintiff on medications including Prozac, Vistaril, Trazadone, and Lexapro. (R. at 391.)

Plaintiff's mental status examination at ABH indicated that her speech was pressured or rapid, her mood was sad/depressed, she was anxious, and she had difficulty concentrating. (R. at 407.)

Plaintiff was under the care Ms. Teresa Witmer, a social worker who provided psychotherapy at ABH. (R. at 31.) Ms. Witmer

---

[1]The GAF scale ranges from 0 to 100 and indicates a clinician's judgment of a patient's overall symptom severity and functioning level. A GAF of 51-60 indicates a person with moderate symptoms or moderate difficulty in social, occupation, or school functioning. A GAF of 61-70 indicates a person with some mild symptoms or some difficulty in social, occupational, or school functioning, but who is generally functioning well and has some meaningful interpersonal relationships. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th ed., 2000).

opined that Plaintiff was "disabled by her physical and emotional issues." (R. at 31.) The record contains progress reports, many of which are signed by Ms. Witmer, indicating that Plaintiff occasionally reported feeling better (R. at 471, 474), but at other times complained of symptoms and impairments similar to those described above (R. at 470, 472-73, 475-82, 485-86).

**ii. Non-Examining and Other Source Evaluations of Mental Impairments**

Two consulting medical sources issued reports on Plaintiff's mental impairments. In May 2006, Dr. Lawrence Seifer performed a consultative mental examination. (R. at 319.) Dr. Seifer noted that Plaintiff had unremarkable gait and posture and was pleasant and cooperative. (R. at 320.) Dr. Seifer observed that Plaintiff's interview was marked by continuous movement and restlessness due to her pain and anxiety and that her facial expression suggested worry and uneasiness. (R. at 320.) Further, he described Plaintiff's speech quantity as somewhat excessive, her mood as anxious, her affect as appropriate, and her attention as slightly impaired. (R. at 320-21.) Plaintiff's concentration was intact, she had logical and coherent thought processes, and there was no indication of delusions or hallucinations. (R. at 321.) But she had deficits in immediate memory. (R. at 321.) Dr. Seifer estimated that she was of average intelligence with a normal

abstracting ability. (R. at 321.)  He also found that she had intact social judgment, but inadequate test judgment. (R. at 321.)

Dr. Seifer opined that she was able to function independently and could follow simple and complex instructions. She said that her ability to relate was "[g]ood, but a lot of the time I don't want to be bothered." (R. at 320.) He assessed that Plaintiff had moderate limitations that were enduring and were due to a combination of her physical and mental impairments. (R. at 321.) Dr. Seifer diagnosed adjustment disorder with depressed mood and panic disorder without agoraphobia. (R. at 321.)

Dr. Wayne Tillman, a State agency psychological consultant, also reviewed the record. (R. at 322–39.) He assessed that Plaintiff had an adjustment disorder with depressed mood (R. at 325) and had panic disorder without agoraphobia (R. at 327). He found that Plaintiff had a mild restriction in her activities of daily living; moderate limitations in social functioning; mild limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (R. at 332.) Dr. Tillman opined that Plaintiff could understand and carry out four-step instructions; maintain attention, concentration, persistence, pace, and attendance standards required in a normal work environment; and, with some difficulty, adapt to changes in the work setting and respond appropriately to criticism from supervisors. (R. at 338.)

The record does not describe any treatments, other than therapy, prescribed for Plaintiff's mental conditions.

**D. ALJ's Decision on Remand**

After conducting the required five-step sequential analysis, described <u>infra</u>, the ALJ found that Plaintiff was not disabled.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the onset of her disability through her date last insured. (R. at 27.) At step two, the ALJ found that Plaintiff had "severe impairments of cervical and lumbosacral spine strains with degenerative changes, plus depression." (R. at 27.) He did not find that Plaintiff's Generalized Anxiety Disorder was a severe impairment. At step three, he determined that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments listed in the Act's regulations. (R. at 27.)

The ALJ then determined Plaintiff's RFC. He found that Plaintiff could perform a range of unskilled sedentary to light work. (R. at 28.) The ALJ described Plaintiff's RFC as follows:

> [I]n an eight-hour workday, [Plaintiff] could sit about six hours, stand/walk about three hours, and lift/carry up to twenty pounds occasionally. In addition, [Plaintiff] could only occasionally climb, balance, stoop, kneel, crouch or crawl. Further, [Plaintiff] retained the ability to understand, remember and carry out simple instructions, make judgments that are commensurate with the functions of unskilled work, and make simple work related decisions. [Plaintiff] also retained the ability to respond appropriately to the public, coworkers and

supervisors, and deal with pressures and changes in a
routine work environment . . . . With respect to
functional limitations, the [Plaintiff] had mild
restrictions of activities of daily living, moderate
difficulties in maintaining social functioning, mild
to moderate difficulties maintaining concentration,
persistence or pace, and no episodes of
decompensation.

(R. at 28.)

In support of his RFC determination, the ALJ noted that he
was discounting Dr. Kuponiyi's opinion because it was inconsistent
with the clinical findings and diagnostic studies. (R. at 29.) The
ALJ noted that Dr. Kuponiyi treated Plaintiff since 1998;
described her persistent pain despite medications, epidural
injections, and physical therapy; and opined that Plaintiff would
be disabled for six to twelve months. (R. at 29.) But, the ALJ
determined that this opinion was inconsistent with the finding
that her neurofibroma was benign and that other diagnostic studies
at the time showed that her cervical and lumbosacral spines had no
significant abnormalities. (R. at 29.) Additionally, the ALJ noted
that both Dr. Steel and Dr. Banger reported minimal clinical
findings. (R. at 29.) Accordingly, the ALJ determined that Dr.
Kuponiyi's opinion was a well-intentioned effort to help Plaintiff
secure disability payments, but was unpersuasive. (R. at 29.)

The ALJ also considered the opinion of Dr. Jaffrey,
Plaintiff's neurologist. (R. at 29-30.) Specifically, he noted
that Dr. Jaffrey found muscle spasms of the cervical and

lumbosacral spines, but also found normal motor findings, with normal muscle bulk and tone, and full ranges of motion. (R. at 29.) Additionally, the ALJ found that Dr. Jaffrey made normal neurological findings, with no numbness or tingling. (R. at 29.) The ALJ also noted that an MRI showed a disc bulge or herniation at L4-5 with mild neural foraminal stenosis and a disc herniation at L5-S1 with mild neural foraminal stenosis. (R. at 29.)

Additionally, the ALJ supported his RFC determination by discounting the opinion of Ms. Witmer, the social worker. (R. at 31.) The ALJ found that Ms. Witmer's opinion that Plaintiff was disabled by her physical and emotional issues was inconsistent with the clinical findings and diagnostic studies. (R. at 31.) Specifically, the ALJ found that, at ABH, Plaintiff's GAF was consistently rated at 55. In addition, more recent progress notes from ABH showed a record of ongoing management and evaluation with exacerbations and remissions in Plaintiff's condition. (R. at 31-32.) The ALJ also noted that Dr. Seifer reported that Plaintiff was well-oriented to time, date, person and place; thought and spoke logically; and had no difficulty concentrating or remembering things. (R. at 31.) He concluded that Ms. Witmer's opinion was a well-intentioned effort to help Plaintiff gain disability payments, but was not persuasive. (R. at 31.)

In assessing Plaintiff's credibility for purposes of the RFC determination, the ALJ found that, while the Plaintiff "may

experience some subjective symptoms, they are not of such
severity, frequency, or duration as to preclude the performance of
a range of unskilled sedentary to light work." (R. at 32.) In
support of his finding, the ALJ noted Plaintiff's testimony that,
because of her neck and lower back pain, she was unable to sit,
stand, or walk for prolonged periods of time, or lift/carry
significant weights in a work setting. (R. at 29.) However, the
ALJ also found that Drs. Banger and Steel reported minimal
findings in their evaluations of Plaintiff; an August 2006 MRI
showed small disc protrusions at L4-5 and L5-S1 with moderate
stenosis but a repeat MRI in December 2009 showed small disc
protrusions at the same locations with mild neural foraminal
stenosis; and an EMG study in 2009 produced normal results. (R. at
32.) Additionally, the ALJ noted that during a recent examination,
Dr. Banger reported that Plaintiff's marked difficulty in walking
and climbing onto the examination table did not correlate with the
objective medical findings. (R. at 32.) The ALJ concluded that
Plaintiff's allegations regarding the symptoms and limitations of
her condition were credible only to the extent that they were
consistent with his decision. (R. at 32.)

The ALJ stated that, "the evidence is equivocal in this case,
but, on balance, the weight of the evidence shows that the
claimant is able to do a range of unskilled sedentary to light
work." (R. at 32.) The ALJ then concluded that, based on

Plaintiff's RFC and the evidence presented, Plaintiff was unable to perform any past relevant work. (R. at 32.)

At step five, the ALJ found that there were a significant number of jobs available in the national economy which Plaintiff could perform. (R. at 33.) To arrive at this conclusion, the ALJ noted that since Plaintiff had both exertional and non-exertional limitations, no rule in the Medical-Vocational Guidelines was strictly applicable. (R. at 33.) He found that "although the [Plaintiff's] additional non-exertional limitations do not allow her to perform the full range of sedentary to light work, the range of jobs the claimant can perform is not significantly diminished by [her] non-exertional limitations." (R. at 33.)

The ALJ did not obtain VE testimony. (R. at 95.) He instead relied upon the suggestions of a state agency consultant whose report was dated before the date of the initial hearing, i.e., before the Appeals Council issued the remand order instructing the ALJ to obtain a VE's testimony. (R. at 204.) The state agency consultant determined that Plaintiff could perform the work of a "button and notion sticker", a "buckle and wire inserter", and a "surveillance system monitor", all of which are unskilled, sedentary labor. (R. at 33.) The ALJ concluded that citing these three jobs satisfied the Commissioner's burden of showing that work existed in significant numbers in the national economy which Plaintiff could perform. (R. at 33.) Accordingly, the ALJ found

that "a finding of 'not disabled' [wa]s therefore appropriate under SSR 85-15." (R. at 33.) The ALJ did not explain why SSR 85-15 supported his conclusion.

**E. Parties' Arguments**

Plaintiff presents three arguments on appeal. First, she asserts that the ALJ erred as a matter of law at step five of the sequential analysis by failing to follow the Appeals Council's remand order to take testimony from a VE. [Docket Item 13 at 19.]

Second, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. [Id.] Specifically, Plaintiff argues that the ALJ (1) did not provide substantial evidence to support his decision to discount Dr. Kuponiyi's opinion, (2) did not give proper weight to Dr. Jaffrey's opinion, (3) did not give proper weight to Ms. Witmer's opinion, and (4) did not properly evaluate Plaintiff's credibility. [Id. at 22-35.]

Finally, Plaintiff argues that the ALJ erred by finding that Plaintiff's Generalized Anxiety Disorder did not constitute a severe impairment at step two. [Id. at 35-37.]

Defendant asserts that the Commissioner's decision should be upheld because it is supported by substantial evidence. [Docket Item 14 at 4-8.] Defendant argues that the lack of VE testimony does not warrant a remand. [Id. at 8.] Defendant contends that the Appeals Council's remand order indicated that use of a VE was

discretionary and that the ALJ used his discretion to decide that VE testimony was unnecessary. [Id. at 9-10.]

In response to Plaintiff's second argument, Defendant argues that substantial evidence supports the ALJ's RFC determination. [Id. at 12-22.] Specifically, Defendant argues that substantial evidence shows that (1) Plaintiff could perform the exertional demands of sedentary work and a range of light work, (2) Plaintiff could perform the basic mental demands of unskilled work, and (3) the ALJ properly evaluated Plaintiff's credibility. [Id.] Additionally, Defendant argues that the ALJ had no obligation to discuss every piece of medical evidence. [Id. at 22.]

Finally, Defendant argues that the ALJ's finding that Plaintiff's Generalized Anxiety Disorder was not a severe impairment does not warrant a remand. [Id.] Defendant argues that any errors at step two are harmless as long as the ALJ continues the sequential analysis. [Id.] Defendant notes that the ALJ expressly considered Plaintiff's symptoms of anxiety when determining her RFC. [Id. at 22-23].

In reply, Plaintiff asserts that she did not receive notice that the Commissioner intended to use an alternative to VE testimony.[2] [Docket Item 15 at 3-4.] Plaintiff concedes that the

_____

[2] Plaintiff alleges that she was not given notice that the Commissioner intended to utilize an SSR instead of VE testimony to sustain her burden of proof. Defendant does not contest this point.

ALJ need not discuss every piece of medical evidence, but emphasizes that the ALJ insufficiently explained his conciliations and rejections of the medical evidence. [Id. at 5-7.]

**III. DISCUSSION**

    **A. Standard of Review**

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). See Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). The Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001). Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38.

The ALJ must set out a specific factual basis for each finding. Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). "When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d

422, 429 (3d Cir. 1999) (internal citations omitted). While a
court should not "expect the ALJ to make reference to every
relevant treatment note in a case," Fargnoli, 247 F.3d at 42,
"[t]he ALJ's failure to address evidence in direct conflict with
his/her findings . . . is erroneous." Landeta v. Comm'r of Soc.
Sec., 191 Fed. Appx. 105, 110 (3d Cir. 2006).

### B. Legal Standard For Determination of Disability

Under the Social Security Act, a "disability" is defined, for
the purposes of a plaintiff's entitlement to benefits, as the
inability "to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment . . .
which has lasted or can be expected to last for a continuous
period of not less than twelve months." 42 U.S.C. §
1382c(a)(3)(A); see Plummer, 186 F.3d at 427. A claimant is
considered unable to engage in any substantial gainful activity
"only if his physical or mental impairment or impairments are of
such severity that he is not only unable to do his previous work
but cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful work which exists
in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The disability determination involves a five-step sequential
process:

> In step one, the Commissioner must determine whether the
> claimant is currently engaging in substantial gainful
> activity . . . . If a claimant is found to be engaged in

substantial activity, the disability claim will be
denied . . . .

In step two, the Commissioner must determine whether the
claimant is suffering from a severe impairment . . . .
If the claimant fails to show that her impairments are
"severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical
evidence of the claimant's impairment to a list of
impairments presumed severe enough to preclude any
gainful work . . . . If a claimant does not suffer from
a listed impairment or its equivalent, the analysis
proceeds to steps four and five.

Step four requires the ALJ to consider whether the
claimant retains the residual functional capacity to
perform her past relevant work . . . . If the claimant
is unable to resume her former occupation, the
evaluation moves to the final step.

At this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability . . . . The ALJ must show
there are other jobs existing in significant numbers in
the national economy which the claimant can perform,
consistent with her medical impairments, age, education,
past work experience, and residual functional capacity.
The ALJ must analyze the cumulative effect of all the
claimant's impairments in determining whether she is
capable of performing work and is not disabled . . . .

Plummer, 186 F.3d at 428 (internal citations omitted).

On appeal, Plaintiff challenges the ALJ's decisions at steps
five, four, and two. The Court analyzes each issue in turn.

## C. The Commissioner Did Not Sustain her Burden of Proof at Step Five

The first issue on appeal is whether the Commissioner
sustained her burden of proof at step five to show that Plaintiff
was able to perform work that existed in the national economy.

Plaintiff contends that the ALJ erred by failing to obtain testimony from a VE. The Court holds that the Commissioner did not sustain her burden of proof at step five.

At step five, the Commissioner bears the burden of providing evidence to show that work exists in significant numbers in the national economy which, considering a plaintiff's RFC and other vocational factors, the plaintiff could perform. 20 C.F.R. §§ 404.1560(c)(2) & 416.960(c)(2); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000). In determining whether a plaintiff can successfully perform work that exists in the national economy, the Commissioner must consider a plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines (hereinafter "Grids") established by the Social Security Administration. 20 C.F.R. § 404.1569a(a).

If the plaintiff has both exertional and non-exertional limitations, the Grids merely provide a framework for determining whether work exists in the national economy in sufficient numbers. 20 C.F.R. § 404.1569a(d). When the Grids are used only as a framework, the Commissioner must use other evidence to "persuade an ALJ . . . that jobs exist in the national economy that the [plaintiff] is able to fill." Santise v. Schweiker, 676 F.2d 925, 935 (3d Cir. 1982). The Commissioner can satisfy this burden by introducing testimony from a VE describing which, if any, positions can be performed by a person possessing the applicant's

particular skills. Id. Use of a VE's testimony is not required;

the Commissioner can rely on a Social Security Ruling ("SSR")[3]

instead. See Allen v. Barnhart, 417 F.3d 396, 406 (3d Cir. 2005).

However, if the Commissioner "wishes to rely on an SSR as a

replacement for a vocational expert, it must be crystal-clear that

the SSR is probative as to the way in which the non-exertional

limitations impact the ability to work, and thus, the occupational

base." Id. at 407. Additionally, an ALJ who relies on an SSR must

explain why the SSR is "relevant or controlling." Id. Moreover,

the Commissioner must provide notice to the plaintiff that she

intends to rely on an SSR instead of a VE. Id. at 407-08 (holding

that notice is necessary so that claimants can consider opposing

the Commissioner's proffer by calling their own expert witness).

Essentially, the ALJ may rely on an SSR only if (1) its probative

value is crystal clear, (2) the ALJ explains why it is relevant or

controlling, and (3) the claimant received notice of the

Commissioner's intent to rely on an SSR.

In this case, the ALJ did not satisfy the requirement to

either (1) obtain evidence from a VE, or (2) provide notice that

---

[3] "Social Security Rulings do not have the force and effect of the
law or regulations but are to be relied upon as precedents in
determining other cases where the facts are basically the same. A
ruling may be superseded, modified, or revoked by later
legislation, regulations, court decisions or rulings." Heckler v.
Edwards, 465 U.S. 870, 873 n.3 (1984) (internal quotations and
citations omitted).

the Commissioner intended to rely on an SSR that had a crystal-clear probative value. The ALJ did not obtain supplemental evidence from a VE. (R. at 95.) Instead, the ALJ referenced a state agency consultant, who offered examples of jobs available in the national economy (R. at 33) and stated that citing those jobs satisfied the Commissioner's burden. (R. at 33.) The ALJ concluded that a finding of "not-disabled" was appropriate for Plaintiff according to SSR-85-15. (R. at 33.) The ALJ did not explain why SSR-85-15 was relevant or controlling.

SSR-85-15 provides that when a plaintiff has non-exertional impairments, the Grids are used as a framework to determine whether the individual's ability to work is diminished. It specifically addresses the relationship between mental impairments and job activity, and it provides specific examples of when a finding of disability is appropriate for individuals with mental impairments. SSR-85-15. However, SSR-85-15 states that its purpose is to clarify policies applicable in cases involving the evaluation of solely non-exertional impairments. Because Plaintiff's case is not one in which there are "solely" non-exertional impairments, SSR-85-15 is not probative.

Even if SSR-85-15's probative value were crystal clear, Plaintiff was not notified that the Commissioner intended to rely on it and the ALJ did not explain why it was relevant or controlling.

28

The ALJ did not meet the requirements for reliance on an SSR. Plaintiff did not receive notice, the ALJ did not explain why SSR-85-15 was relevant and controlling and, most importantly, it is not crystal clear that SSR-85-15 is probative. Accordingly, the Court will vacate the Commissioner's decision and remand.

Alternatively, the Court vacates and remands the Commissioner's decision because the ALJ failed to comply with the Appeals Council's remand order, which stated,

> Upon remand, the Administrative Law Judge will . . . [o]btain supplemental evidence from a vocational expert to clarify the demands of the claimant's past relevant work and/or the effect of the assessed limitations on the claimant's occupational base . . . . As appropriate, the Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy . . . .

(R. at 113) (internal references omitted).

The Court is not persuaded by Defendant's argument that the phrase "as appropriate" made it clear that the ALJ had discretion on whether to use VE testimony. The order states that the ALJ "*will* . . . [o]btain supplemental evidence from a vocational expert . . . ." (R. at 113) (emphasis added). This language ordering the ALJ to obtain VE testimony is mandatory, not permissive. The "as appropriate" language indicates that the ALJ had discretion, after hearing the VE's testimony, to decide whether to ask the VE for specific

examples; it did not give the ALJ discretion regarding whether to call a VE in the first place.

Under either an analysis of governing law regarding the Commissioner's burden at step five or an analysis of the ALJ's response to the Appeals Council's order, the ALJ erred as a matter of law and the Commissioner therefore did not sustain her burden of proof at step five. The Commissioner's final decision will be vacated and remanded.

## D. Substantial Evidence Does Not Support the ALJ's Determination of Plaintiff's RFC at Step Four

In her second argument, Plaintiff argues that the RFC determination is not supported by substantial evidence because the ALJ failed to give appropriate weight to the opinions of Dr. Kuponiyi, Dr. Jaffrey, and Ms. Witmer and to Plaintiff's credibility. The Court holds that substantial evidence does not support the ALJ's RFC determination. The ALJ did not consider all medical evidence that conflicted with his decision and did not explain his reasons for discounting Plaintiff's credibility.

### i. The ALJ Failed to Address Contrary Medical Evidence

#### (a) Legal Standard for Weight Given to Opinion Evidence

In reviewing the ALJ's decision, the Court must heed three principles: (1) medical opinions about whether a plaintiff is disabled are never entitled to controlling weight, (2) treating physician opinions are entitled to controlling weight if they are

supported by medical evidence and are not inconsistent with other substantial evidence, and (3) non-examining medical opinions can be given significant weight if they are supported by substantial evidence and are not inconsistent with other substantial evidence.

An ALJ must consider every medical opinion and decide how much weight to give the opinion. 20 C.F.R. § 404.1527(c). The ultimate decision about whether a plaintiff is disabled is reserved for the Commissioner. 20 C.F.R. § 404.1527 (d) & (d)(1). "[T]reating source[4] opinions on issues that are reserved to Commissioner are never entitled to controlling weight or special significance." SSR-96-5p; see also 20 C.F.R. § 404.1527(d)(3). In fact, regardless of the source, opinions on issues reserved for the Commissioner are never entitled to controlling weight or special significance. See 20 C.F.R. § 404.1527(e). Therefore, opinions that conclude that a plaintiff is "disabled" or "unable to work" are not authoritative. See 20 C.F.R. § 404.1527(d)(1).

An ALJ must, however, "accord treating physicians' reports great weight especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Plummer, 186 F.3d at 429 (internal citations omitted). Treating physicians' opinions

---

[4] A treating source is defined as "[a plaintiff's] own physician, psychologist, or other acceptable medical source who provides . . . or has provided . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]. 20 C.F.R. § 404.1502.

are entitled to "substantial and at times even controlling weight." Fargnoli v. Apfel, 247 F.3d 34, 43 (3d Cir. 2001). If treating opinions are well-supported by medical evidence and not inconsistent with other substantial evidence, they are entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2); SSR-96-2p. "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186. F.3d at 429.

The ALJ must also consider the findings and opinions of state agency medical consultants and other sources consulted in connection with ALJ hearings. 20 C.F.R. § 404.1527(e)(2)(i). If non-examining medical source opinions are supported by medical evidence in the record, they may constitute substantial evidence and override a treating physician's opinion. Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd per curiam, 85 F.3d 611 (3d Cir. 1996); see also 20 C.F.R. § 404.1527(e).

"When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer, 186 F.3d at 429 (internal citations omitted). An ALJ errs by failing

to address evidence in direct conflict with his findings. <u>Landeta</u>, 191 Fed. Appx. at 110.

### (b) Dr. Kuponiyi

Plaintiff argues that the ALJ's decision to discount the weight of Dr. Kuponiyi's opinion is not supported by substantial evidence. The Court agrees. The ALJ did not address all the evidence that supports Dr. Kuponiyi's opinion.

The ALJ discounted Dr. Kuponiyi's opinion because he believed it was inconsistent with other evidence, including findings that Plaintiff's neurofibroma was benign, there were no significant abnormalities of the cervical and lumbosacral spines, Plaintiff had normal ranges of motion, and Plaintiff only had a lumbosacral strain. (R. at 29.) The ALJ considered some medical evidence that conflicted with his decision to discount Dr. Kuponiyi's opinion, but he did not consider all conflicting evidence. Plaintiff identified medical evidence that the ALJ failed to consider, including (1) MRI results that show L4-5 superimposed central disc herniation and annular tear, indentation upon the ventral aspect of the thecal sac, and a similar L5-S1 indentation of the thecal sac; (2) nerve conduction studies that showed superimposed L4-L5 and L5-S1 lumbosacral radiculopathies; (3) an EMG study showing L4, L5 radiculopathy; and (4) the portion of Dr. Steel's opinion which states that Plaintiff had chronic low back syndrome with

atypical bilateral lower extremity radiculopathies. [Docket Item
13 at 24-25.] This evidence, including two MRIs showing disc
herniation, would seem to be quite compatible with Dr. Kuponiyi's
diagnosis and Plaintiff's lower back pain over the years in
question. This evidence could support Dr. Kuponiyi's assessment of
Plaintiff's physical limitations.

The ALJ failed to address this evidence. Although Defendant
rightly asserts that the ALJ need not reference every relevant
piece of medical evidence, [Docket Item 14 at 22], the ALJ must
explicitly consider all medical evidence that is inconsistent with
his decision, which, in this case, includes Dr. Kuponiyi's
opinion. See Landeta, 191 Fed. Appx. at 110. The ALJ erred by
discussing some, but not all, of the medical evidence contrary to
his decision to discount Dr. Kuponiyi's opinion.

Accordingly, the Court holds that substantial evidence does
not support the ALJ's determination of Plaintiff's RFC. The ALJ,
on remand, is directed to further consider his determination of
Plaintiff's RFC as to the weight he affords to Dr. Kuponiyi's
opinion. If the ALJ decides to discount Dr. Kuponiyi's opinion, he
must fully explain his reasons for discounting evidence that is
inconsistent with his findings.

### (c) Dr. Jaffrey

Dr. Jaffrey is Plaintiff's treating neurologist. Plaintiff
contends that the ALJ's decision to not give more weight to Dr.

Jaffrey's opinion is not supported by substantial evidence. The Court disagrees.

Plaintiff argues that Dr. Jaffrey's opinions[5] "as to the limitations in the areas of standing and sitting" should have been given significant weight "especially due to the objective findings." [Docket Item 13 at 27.]

Dr. Jaffrey's objective findings were that Plaintiff should avoid "prolonged sitting and standing" (R. at 514), but he did not define "prolonged." In his decision, the ALJ found that Plaintiff could, in an eight-hour workday, "sit about six hours" and "stand/walk about three hours". (R. at 28.) It is not clear that Dr. Jaffrey's opinion is inconsistent with this finding because it is not clear what Dr. Jaffrey intended the word "prolonged" to mean. Moreover, the ALJ cited substantial evidence that supports his RFC determination. Specifically, the ALJ noted that Dr. Pirone found that Plaintiff could sit about six hours (R. at 30) and Dr. Banger found that Plaintiff could stand about three hours (R. at 31).

---

[5] The Commissioner argues that there is no opinion authored by Dr. Jaffrey on the record. [Docket Item 14 at 16.] She notes that Plaintiff refers to a narration of Dr. Jaffrey's medical notes that was recorded by Dr. Antebi. [Id.] Since these notes in the record were "related by a third party and [are] not signed by or otherwise attributed directly to Dr. Jaffrey," the Commissioner contends the ALJ was under no obligation to afford them any weight. [Id.] Because the Court will not remand on the basis of Dr. Jaffrey's opinion, the Court need not address this argument.

Because Dr. Jaffrey's opinion is unclear and because the
ALJ's decision is supported by substantial evidence, the Court
will not remand on this issue.

### (d) Ms. Witmer

Ms. Witmer is a licensed clinical social worker who counseled
Plaintiff. (R. at 31, 416.) Plaintiff argues that Ms. Witmer's
opinion should be given "significant weight" because she had the
best "longitudinal" perspective of Plaintiff's mental impairments.
[Docket Item 13 at 31.] Plaintiff asserts that "if Ms. Witmer's
findings were given greater weight, Plaintiff's RFC as to her
mental limitations would prevent her from performing even
sedentary work . . . . ." [Id. at 32.] This argument lacks merit.

Ms. Witmer opined that Plaintiff was "disabled by her
physical and emotional issues." (R. at 31.) The ALJ discounted Ms.
Witmer's opinion because he found it inconsistent with clinical
findings and medical evidence. (R. at 31.) The ALJ explained his
finding by referencing Plaintiff's consistent GAF rating of 55;
ongoing evaluations that showed Plaintiff had exacerbations and
remissions in her condition; and Dr. Seifer's report that
Plaintiff was well-oriented, thought and spoke logically, and had
no difficulty remembering things. (R. at 31.)

The Court notes that Ms. Witmer's opinion amounts to a
determination that Plaintiff is disabled. But a determination that
a plaintiff is "disabled" is reserved for the Commissioner. 20

C.F.R. § 404.1527(d) & (d)(1).[6] Because decisions about
Plaintiff's disability are reserved to the Commissioner, the ALJ
was not required to give Ms. Witmer's opinion "controlling weight
or special significance." SSR-96-5p; see also 20 C.F.R. §
404.1527(d)(3).

In addition, the ALJ's decision to discount Ms. Witmer's
testimony is supported by substantial evidence. The ALJ explicitly
discussed Ms. Witmer's opinion and cited substantial evidence,
including some of Ms. Witmer's own records, to explain his
decision to discount it. The Court will not remand on this issue.

## ii. The ALJ Failed to Explain His Assessment of Plaintiff's Credibility

Plaintiff's final argument against the RFC determination is
that the ALJ improperly weighed her credibility and failed to
explain his credibility assessment. [Docket Item 13 at 33.] The
Commissioner, however, contends that objective medical findings
support the ALJ's determination that Plaintiff's allegations are
only credible to the extent that they comport with the ALJ's
decision. [Docket Item 14 at 20-22.] The Court holds that the
ALJ's assessment of Plaintiff's credibility was inadequate.

The adjudicator must assess the credibility of a claimant's
symptoms. SSR-96-7p. In making that credibility assessment, the

---

[6] "Although . . . 20 CFR 404.1527(d) explicitly appl[ies] only to
the evaluation of medical opinions from 'acceptable medical
sources,' these same factors can be applied to opinion evidence
from [non-medical sources]." SSR-06-03p.

adjudicator must "[C]onsider . . . statements about the
intensity, persistence, and limiting effects of [a plaintiff's]
symptoms, and . . . evaluate [a plaintiff's] statements in
relation to the objective medical evidence and other evidence." 20
C.F.R. § 404.1529(c)(4). The adjudicator must specifically explain
the credibility determination: the decision "must contain specific
reasons for the finding on credibility, supported by the evidence
in the case record, and must be sufficiently specific to make
clear to the individual and to any subsequent reviewers the weight
the adjudicator gave to the individual's statements and the
reasons for that weight." SSR-96-7p. Therefore, the ALJ was
required to specifically explain his decision to discount
plaintiff's credibility.

In this case, the ALJ did not explain why he discredited the
credibility of Plaintiff's allegations about her symptoms and
impairments. The ALJ briefly described Plaintiff's testimony (R.
at 28-29) followed by a more extensive explanation of the medical
evidence on which he based his decision (R. at 29-32), and
concluded that Plaintiff's "allegations regarding symptoms and
limitations are credible only to the extent that they are
consistent with this decision." (R. at 32.) Although the ALJ
discussed the medical and non-medical evidence that he relied upon
in determining Plaintiff's RFC, he did not identify any particular
aspects of her testimony that lack credibility, nor did he explain

why he found her credibility to be lacking. Therefore, this Court cannot uphold the ALJ's assessment of Plaintiff's credibility. On remand, the ALJ should fully consider Plaintiff's credibility and clearly explain the reasons for his assessment.

To summarize the Court's analysis of the second issue on appeal, the ALJ's determination of Plaintiff's RFC was not supported by substantial evidence. On remand, the ALJ should reconsider Plaintiff's RFC and should clearly explain the weight given to both Dr. Kuponiyi's opinion and to Plaintiff's testimony.

**E. Any Error at Step Two Is Harmless**

The third issue raised on appeal is whether the ALJ properly determined that Plaintiff's Generalized Anxiety Disorder was not a severe impairment. Plaintiff argues that the ALJ erroneously concluded that Plaintiff's Generalized Anxiety Disorder was not a severe impairment and, thus, failed to consider medical evidence about her anxiety, including a series of ABH progress notes describing her anxiety symptoms, Dr. Seifer's notation of symptoms of anxiety and panic disorders, and Dr. Steel's finding that Plaintiff had well-entrenched anxiety. [Docket Item 13 at 35-36.] The Court holds that any error committed by the ALJ at step two is harmless, and thus, remand is not warranted on this issue.

At step two, "an impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR-96-

3p. However, an error at this step is harmless as long as the ALJ proceeds past step two: if the ALJ finds in a plaintiff's favor at step two, "even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless." Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 145 n.2 (3d Cir. 2007) (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005.)); accord Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step"); Rabbers v. Comm'r of Soc. Sec., 582 F.3d 647, 658 (6th Cir. 2009) ("Notwithstanding [a step two] error, the ALJ ultimately concluded that [plaintiff] had a severe mental impairment and proceeded to step three, which was all [plaintiff] could have asked for."); Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) ("the ALJ considered any limitations posed by the [impairment] at Step 4 . . . . any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless").

Error at step two is harmless when an ALJ proceeds through the subsequent steps because, when an ALJ makes an RFC determination, he must consider the combined effect of all the plaintiff's impairments, whether those impairments are severe or not-severe. See 20 C.F.R. § 404.1523 (the Commissioner "will consider the combined effect of all [plaintiff's] impairments

without regard to whether any such impairment, if considered separately, would be of sufficient severity").

In this case, even if the ALJ erred by finding that Plaintiff's Generalized Anxiety Disorder was not severe, the error was harmless because the ALJ found that Plaintiff had severe impairments and continued the sequential analysis. (R. at 27-28.)

In determining Plaintiff's RFC, the ALJ considered Plaintiff's Generalized Anxiety Disorder. (R. at 31.) For example, the ALJ noted that Plaintiff suffered from anxiety and panic attacks (R. at 31) and anxiety attacks featuring shortness of breath (R. at 29). Additionally, the ALJ relied upon the medical opinions of Dr. Seifer and Dr. Tillman, both of whom explicitly considered the symptoms of anxiety in their reports. (R. at 31, 319-21, 322, 325, 327, 337, 338.) The ALJ's opinion also specifically referenced the ABH progress notes. (R. at 31-32.)

Any error committed by the ALJ at step two by failing to define Plaintiff's Generalized Anxiety Disorder as a severe impairment was harmless.[7] Accordingly, remand is not warranted to reconsider the step two determination.

**IV.   CONCLUSION**

The Court will vacate the Commissioner's final decision and remand for further proceedings consistent with this Opinion.

---

[7] Because any error was harmless, the Court need not assess whether the ALJ's step two determination was actually erroneous.

On remand, the Commissioner must sustain her burden of proof that work exists in substantial numbers in the national economy which Plaintiff could perform. To sustain this burden, the Commissioner must either obtain a VE's testimony or provide notice that the she intends to rely on an SSR. The probative value of the SSR must be crystal clear and explained in the ALJ's opinion.

Additionally, the Commissioner should reconsider her determination of Plaintiff's RFC. Specifically, the Commissioner should further consider and clearly explain the weight afforded to Dr. Kuponiyi's opinion and to Plaintiff's credibility.

The accompanying Order will be entered.


 **August 21, 2013**                         **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             Chief U.S. District Judge